UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,     :

                                   :     **MEMORANDUM & ORDER**

        -against-            :     05-CR-113 (DLI)

                                   :

ANDREW IVANSON, et. al.,        :

                                   :

           Defendant.     :
-------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Defendant Andrew Ivanson is charged with conspiracy to commit health care fraud (Count One), health care fraud (Court Two) and making false statements in relation to a health care matter (Count Three) in violation of 18 U.S.C. §§ 1349, 1347 and 1035, respectively. Before the court is Ivanson's motion to suppress several post-arrest statements due to alleged violations of his Fifth Amendment rights. For the reasons set forth below defendant's motion to suppress is denied.

## CREDIBILITY FINDINGS

A hearing was held on November 3, 2006 and November 16, 2006 during which Special Agent Karen Walsh ("Walsh") testified for the government and Rimma Shpak ("Shpak"), a civil attorney, and Alexandra V. Tseitlin ("Tseitlin"), co-counsel for defendant testified for the defense. To the extent indicated below, the court finds the testimony of each of the witness to be credible.

## FINDINGS OF FACT

On January 18, 2005, Walsh, along with Special Agents Ji Hwang, Brad Price, Peter Chung , Ryan Noon, and IRS Special Agent Tom Cribbins arrested Ivanson at his home located at 481 Bedford Avenue, Brooklyn, New York. Exhibit A to the Affirmation of Alexandra Tseitlin ("Tseitlin Aff."). The arrest was made pursuant to an arrest warrant issued by this court. *Id.* When arrested, Ivanson had already retained Tseitlin to assist him in responding to a subpoena issued by

the U.S. Attorney's Office for the Eastern District of New York more than two years earlier. Transcript of November 16, 2006 Suppression Hearing ("Tr.2") 4. The subpoena was related to the investigation that lead to Ivanson's arrest. In August of 2003, Tseitlin had contacted Walsh as part of her representation of Ivanson in relation to the subpoena. Tseitlin Aff. ¶¶ 2, 4, 6; Tr.2 5, 8. Tseitlin also contacted Keir Dougall, an Assistant United States Attorney assigned to the investigation, and Special Agent Maryanne Wintonick. *Id.* at ¶¶ 3, 5; Transcript of the November 3, 2006 Suppression Hearing ("Tr.") 53; Tr.2 4, 6. On September 9, 2003, Tseitlin sent documents responsive to the subpoena to Agent Walsh along with a letter which identifying herself as Ivanson's attorney. *Id.* at ¶ 6; Defendant's Exhibit B; Tr.2 8-9. Agent Walsh was aware that Tseitlin was representing Ivanson for the purposes of responding to the subpoena. Tr. 53, 73.

Walsh was the senior agent supervising Ivanson's arrest on January 18, 2005. Tr. 19. Upon placing Ivanson under arrest, Walsh advised him that he should take money, his passport and the telephone numbers of his attorneys. Tr. 13-14. According to Walsh, the purpose of this advice was to enable him to expedite his arraignment by arranging to meet his attorneys at the Eastern District of New York courthouse prior to his arraignment. Tr. 17. Ivanson retrieved two business cards and gave them to Walsh. The cards had the telephone numbers of Tseitlin and Shpak. Tr. 16; Gov't Exhibit 2. According to Ivanson, upon being placed under arrest in his apartment, he "told Walsh that [he] wanted to consult with [his] attorney." Affidavit of Andrew Ivanson ("Ivanson Aff.") ¶ 4. According to Walsh, Ivanson "did not request the opportunity to speak to an attorney while [they] were at his apartment." Declaration of Karen Walsh in Opposition to Defendant's Motion to Suppress ("Walsh Decl.") ¶2; Tr. 18. It is undisputed, however, that Ivanson told Walsh that Tseitlin was his attorney, and that Ivanson located Tseitlin's number and gave it to her. Ivanson Aff.

¶ 4. According to Ivanson, Walsh told him that she would contact Tseitlin when they arrived at the FBI's office. *Id.* Walsh denied telling Ivanson that she would contact Tseitlin. Tr. 18. Rather, Walsh testified that she merely told Ivanson that he would be permitted to make any calls he wished once they arrived at the FBI office. *Id.*

After the arrest, Walsh and Ivanson (among others) proceeded to the FBI office in Manhattan to process his arrest. *Miranda* rights were administered orally to Ivanson on the way to the FBI office. Walsh Decl. ¶ 3; Ivanson Aff. ¶ 5; Tr. 20-21. According to Walsh, Ivanson was asked whether he understood the rights and whether he was willing to waive them. Ivanson answered orally that he both understood the rights and was willing to waive them. Walsh Decl. ¶ 3; Tr. 22-25. According to Ivanson, neither Walsh nor any of the other agents asked whether he wanted to waive his rights. Ivanson Aff. ¶ 5.

At approximately 8:03 a.m., upon arriving at the FBI office in lower Manhattan, Ivanson was given a written form advising him of his *Miranda* rights. Walsh Decl. ¶ 4; Ivanson Aff. ¶ 6; Tr. 27-28. Ivanson signed the form, which indicated that he understood his rights and was willing to answer questions without an attorney present. *Id.* According to Walsh, Ivanson read the form carefully before signing it. Walsh Decl. ¶ 4. Ivanson claims that he did not read the form carefully and was not aware that he was waving his *Miranda* rights. Ivanson Aff. ¶ 6.

At 8:15 a.m., Ivanson was given the opportunity to make phone calls, because, according to Walsh, they "had some time." Tr. 29; Walsh Decl. ¶ 5; Ivanson Aff. ¶ 8. Ivanson provided Walsh with the names and telephone numbers of three individuals and Walsh dialed. Tr. 30. Walsh wrote down this information as well as the time the calls were made. *Id.* She also noted that two of the calls were made to attorneys. Gov't Exhibit 4. Ivanson left a message for Tseitlin and spoke with

3

Shpak, his attorney for civil matters, and Oleg Modik. Walsh Decl. ¶ 5; Ivanson Aff. ¶ 8. Ivanson asked Shpak if she had been in contact with Tseitlin, his criminal lawyer. Tr. 96. According to Ivanson, Shpak told him that she had contacted Tseitlin, and that Tseitlin would "appear in court for me." Ivanson Aff. ¶ 8; Tr. 98. Walsh did not know what Ivanson was saying to Tseitlin and/or Shpak since he spoke in Russian, a language which Ivanson, Shpak and Tseitlin all speak but that Walsh does not.[1] Tr. 32; Tr.2 15. In the message that Ivanson left for Tseitlin, Ivanson stated that "he needed assistance in dealing with his arrest." Tr.2 16. According to Ivanson, after he left the message, Walsh asked him whether he had spoken with his counsel, to which Ivanson responded that he left a message with Tseitlin and explained that Tseitlin would contact Walsh personally because Tseitlin had Walsh's number. Ivanson Aff. ¶ 9.

It is undisputed that, at 8:31 a.m., Tseitlin called Walsh on her cell phone and left a message advising her that she was Ivanson's attorney and requesting that Ivanson not be questioned in her absence. Tr. 49-50; Tr.2 13-14. Tseitlin left a message on Walsh's cellular telephone. Tr.2 13. Although Walsh's phone records reflect a call to her voice mail at 8:32 a.m., Walsh claimed that Tseitlin's message had not yet registered with her cell phone service provider and she did not receive the message at that time because of poor reception in the room she and Ivanson were in. Tr. 61-62. Walsh also claimed that her cell phone did not register Tseitlin's phone number as a "missed call" at or around 8:31 a.m because her phone did not have that feature.[2] Tr. 58-61. Ivanson alleges that

---

[1]     Shpak does not recall if the conversation she had with Ivanson was in Russian or English, although she tends to speak Russian with Ivanson. Tr. 101.

[2]     In a November 20, 2006 letter (ECF Docket No. 105) submitted by the government at the court's request, the government conceded that Walsh's cellular telephone recorded the number calls that were missed but that the numbers could only be viewed by accessing a separate menu. *Id.*

Walsh was aware that Tseitlin had called and stated to him that she would return Tseitlin's call later, after taking Ivanson's pedigree information. Ivanson Aff. ¶ 8. Walsh asserts that she never told Ivanson she had received a message from Tseitlin and never stated that she would return the call later. Walsh Aff ¶ 7.

Because Walsh believed that Ivanson did not invoke his right to counsel, at around 8:35 a.m., she began to interrogate Ivanson. Tr. 37; Gov't Exhibit 1. Walsh asked Ivanson a few questions, which Ivanson answered. Walsh Decl. ¶ 6; Ivanson Aff. ¶ 10. Ivanson then asked to have his attorney present before he would answer any more questions. Walsh Decl. ¶ 6; Ivanson Aff. ¶ 10; Tr. 37, 36. At that point, at approximately 8:45 a.m., the interrogation stopped. Walsh Decl. ¶ 6; Ivanson Aff. ¶ 11. Walsh then left the room and walked down the hall to her office. Tr. 38. Due to sporadic cell phone service in the interrogation room, it was not until Walsh began to walk back to her office that her cell phone indicated that she had a voice mail. *Id.* Walsh then retrieved the message that Tseitlin has left at 8:31 a.m. *Id*; Walsh Aff ¶ 7; Tr. 66-67. Several minutes later, at 8:50 a.m., Walsh returned Tseitlin's call from a hard line located in the room where Ivanson had been interrogated *Id*; Tseitlin Aff. ¶ 13; Tr. 39; Tr.2 14-15.

## CONCLUSIONS OF LAW

Although there is a dispute regarding whether or not Ivanson asserted his right to counsel immediately after his arrest while he was still in his home, there is no evidence that Walsh or any other Agents interrogated Ivanson *before* he executed the waiver of his *Miranda* rights at the FBI office. Walsh Decl. ¶ 2, 4; Ivanson Aff. ¶ 4, 6. Thus, the preliminary issue the court must address is whether Ivanson knowingly and voluntarily waived his rights after receiving *Miranda* warnings.

Ivanson was verbally advised of his rights in the car ride from his home to 26 Federal Plaza.

Tr. 24. Walsh testified that another FBI agent, Ji Hwang, read a form, verbatim, advising Ivanson

of his rights and, after advising him of each right, asked whether Ivanson understood. *See* Gov't

Exhibit 3; Tr. 23-24. Ivanson answered that he understood all his rights. *Id.* One hour later, Ivanson

was advised of his rights in writing. Gov't Exhibit 1; Tr. 25-26. He signed the form that indicated

he had been advised of his rights and was waiving them. *Id.* Directly above his signature, the form

reads "[a]t this time, I am willing to answer questions without a lawyer present." Gov't Exhibit 3.

Ivanson is a board-certified neurologist who is proficient in English. The court does not credit

Ivanson's allegation that he "did not notice" that "the form [he] signed included a statement that [he]

wished to speak to the agent without a lawyer." Ivanson Aff. ¶ 6. On the evidence that exists in the

record, the court finds that Ivanson's waiver was knowing and intelligent *See U.S. v. Siraj,* 424

F.Supp.2d 509, 513 (E.D.N.Y. 2006) (denying suppression motion where a defendant signed an

identical form and finding that "the credible testimony established that he was indeed given an

opportunity to read the *Miranda* form, and it is undisputed that defendant signed beneath the waiver

clause.").

It is black letter law that a suspect who effectively waives his right to counsel after receiving

*Miranda* warnings can be questioned by law enforcement officers. *North Carolina v. Butler*, 441

U.S. 369, 372-376, 99 S.Ct. 1755, 1756-1759, 60 L.Ed.2d 286 (1979). To prove a valid waiver, the

government must show that "(1) . . . the relinquishment of the defendant's rights was voluntary, and

(2) that the defendant had a full awareness of the right being waived and of the consequences of

waiving that right." *U.S. v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine*, 475

U.S. 412, 421, 106 S. Ct. 1135, 1140, 89 L. Ed. 2d 410 (1986)). "No single factor determines

whether a confession is voluntary." *Id*. (citing *U.S. v. Bye*, 919 F.2d 6 (2d Cir. 1990)). In

determining whether a waiver was knowing and intelligent, courts have focused on how the defendant was advised of his rights, whether he indicated he understood his rights, and generally whether the defendant was capable of comprehending his rights. *Lawrence v. Artuz,* 91 F.Supp.2d 528, 536 (E.D.N.Y. 2000). Clearly, under this standard, Ivanson's initial waiver was knowing and voluntary.

However, notwithstanding any alleged written waiver of his rights, Ivanson claims that he invoked his right to counsel at 8:15 a.m by asking to call his lawyers, speaking with Shpak and leaving a message for Tseitlin. Ivanson further alleges that, even if those acts did not serve as an invocation of his right to counsel, Tseitlin's call to Walsh at 8:31 a.m. directing Walsh not to question Ivanson outside her presence constituted an invocation of his right to an attorney. Thus, the defendant argues, Walsh's interrogation of him after 8:31 a.m. was unconstitutional. The court disagrees.

Invanson's 8:15a.m. Calls to Tseitlin and Shpak Did Not Invoke His Right to Counsel

On the facts adduced at the hearing, the court finds that Ivanson did not invoke his right to counsel when he called Tseitlin and Shpak at 8:15a.m. Walsh knew that Ivanson was calling his attorneys since she had retrieved the cards with their numbers, and also made a notation that two of Ivanson's calls were to counsel.[3] *Id.* To make these calls, Walsh dialed the number, and handed the phone to Ivanson. Tr. 29-32. Walsh was also in the room, a few feet away from Ivanson, when he

---

[3]     In his oral argument before the court, Ivanson's counsel implied that Walsh chose to place a call to Tseitlin's office number, rather than to her cell phone, making it less likely that Tseitlin would answer the call. Tr. 2 58. The testimony indicates that Ivanson "chose who to call" based on the business cards that Walsh provided to him. Tr. 75. Tseitlin's business card has her cell phone number followed by her office number. Gov't Exhibit 2. There is no testimony regarding how or why Walsh chose to call Tseitlin's office number instead of Tseitlin's cell phone number.

spoke on the phone. Ivanson first left a message with Tseitlin, in Russian, and then spoke to Shpak, also in Russian. *Id.* Under these circumstances, Walsh could not have understood defendant's actions to be a request for counsel. *See Davis,* 512 U.S. at 459, 114 S.Ct. at 2355 (holding that a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.").

This case presents a fact pattern similar to that in *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1985). In *Moran,* the government knew that the defendant was represented by an attorney who had contacted the police in an attempt to talk to her client. 475 U.S. at 417, 106 S.Ct. 1135. In holding that the defendant validly waived his *Miranda* rights, the Court in *Moran* noted that the defendant "at no point requested the presence of counsel, as was his right under *Miranda* to do." 475 U.S. at 423 n. 1, 106 S.Ct. 1135. The Supreme Court further noted that the Fifth Amendment requires only "that the police inform the suspect of his right to representation and honor his request that the interrogation cease until his attorney is present." *Id; see also Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994) (holding that, as a general rule, to determine whether an individual has invoked his right to counsel, the court must conduct an objective inquiry into whether a reasonable officer under the circumstances would understand the defendant's statement to be a request for an attorney); *Siraj,* 424 F.Supp.2d at 515 ("[d]efendant's request to call his parents, which he claims was an effort to contact his attorney, was not an invocation of his right to counsel because the questioning officers, objectively, did not understand his request to be for an attorney).

To demonstrate that Walsh should have understood Ivanson's calls to his counsel to be an invocation of his Fifth Amendment rights, Ivanson relies principally on the First Circuit's decision

in *United States v. Porter,* 764 F.2d 1 (1st Cir.1985), a pre-*Davis* case. Ivanson contends that *Porter* stands for the proposition that a defendant who telephones his attorney and leaves a message has invoked his right to counsel. However, the facts of *Porter* are easily distinguished from the facts of this case. In *Porter,* the defendant was advised of his rights and was asked if he wanted to make a telephone call. *Id.* at 6-7. Unlike this case, the defendant had not waived his rights. The defendant called his attorney, who was not available, so the defendant left a message. *Id.* After that, another officer entered the room, asked the defendant if he had been advised of his rights and then proceeded to interrogate him. *Id.* The court in *Porter* applied the law as its existed before *Davis* and found that because "the Supreme Court indicated that the assertion of the right to counsel could be made 'in any manner and at any stage of the process' Porter's attempt to contact his attorney constituted an exercise of his right to counsel." *Id.* The court suppressed the statements because the inculpatory statements were made after the defendant had invoked his right to counsel. In the instant case, the court's decision is governed by *Davis*, not *Porter.*

Significantly, Ivanson's call was not an unequivocal invocation of counsel. In his message to Tseitlin, Ivanson stated that he "needed assistance in dealing with his arrest." Tr.2 16. *Davis* requires that a person being interrogated articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. A "reference to an attorney that is ambiguous or equivocal" is insufficient. *Davis,* 512 U.S. at 459; *see also U.S. v. Lifshitz*, 03 CR. 572, 2004 WL 2072468 *11 (S.D.N.Y. September 15, 2004).

The court's finding is based partially on the fact that, although Walsh was listening to Ivanson's message to Tseitlin, the message was in Russian, a language she does not understand.

9

Tr. 31-32; 75-67. Even if Ivanson had stated that he needed Tseitlin's assistance at the impending

interrogation, such a statement would not have alerted Walsh that Ivanson had invoked his right to

counsel. In *Davis,* the court s acknowledged that " requiring a clear assertion of the right to counsel

might disadvantage some suspects who because of . . .lack of linguistic skills . . .will not clearly

articulate their right to counsel although they actually want to have a lawyer present." *Id* at 460.

The Supreme Court went on to state that "the primary protection afforded suspects subject to

custodial interrogation is the *Miranda* warnings themselves." *Id.* Ivanson, a board certified

neurologist who is proficient in the English language who practiced in New York City, knowingly

and voluntarily waived his *Miranda* rights and had the ability to affirmatively invoke his right to

counsel, if he so desired. As the government points out, Ivanson eventually did unequivocally

invoke his right to counsel, at which time Walsh ceased her interrogation.[4]

Walsh, for her part, maintains that she "understood [Ivanson] to be calling attorneys to

arrange for them to be at the bail hearing in the afternoon." Tr. 32. Under cross-examination,

Walsh admitted that Ivanson did not limit the type of help he wanted to assistance at the bail hearing.

Tr. 76. Whatever assistance Ivanson sought, Walsh was left to speculate as to whether Ivanson had

invoked his right to counsel under the circumstances herein. *See Diaz v. Senkowski,* 76 F.3d 61 (2d

Cir. 1996).

The government correctly argues that, if indeed Ivanson was requesting counsel to assist him

---

[4]     In oral argument, Ivanson's counsel surmises that Ivanson never meant to answer any questions without his counsel present, but that the government's questions started out as innocuous pedigree information, and slowly built into something more incriminating, at which time, according to Ivanson's counsel, Ivanson *again* invoked his right to counsel. Tr.2 68. There is no evidence in the record indicating the type and order of questions asked. What is clear is that, after some questioning, Ivanson unequivocally refused to answer anymore questions without his attorney present.

at the arraignment, this was not an invocation of his Fifth Amendment right to counsel. The Supreme Court has held that a suspect's *Miranda* rights are only invoked by "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police. Requesting the assistance of an attorney at a bail hearing does not bear that construction." *McNeil v. Wisconsin,* 501 U.S. 171, 179, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991). The circuits have made a distinction between the assertion of a right to counsel for Fifth Amendment purposes and the assertion of the right to counsel for Sixth Amendment purposes. The Third Circuit has held that *McNeil* stands for the proposition that the assertion of the right to counsel for an arraignment or a bail hearing (a Sixth Amendment right) does not constitute an invocation of the right to counsel for a subsequent custodial interrogation. *Flamer v. State of Del.*, 68 F.3d 710, 727 (3rd Cir 1995); *see also U.S. v. Charley,* 396 F.3d 1074 (9th Cir. 2005)(invocation of the Sixth Amendment right to counsel alone does not constitute an invocation of the Fifth Amendment right to counsel, even when the interrogation is on the same charge).

The government's contention that Ivanson's calls to his counsel were actually made for the purpose of arranging counsel for his bail hearing is buttressed by several facts in the record. First, Walsh testified that she explained to Ivanson that he should contact his lawyers to expedite the arraignment process. Tr. 32-33. Second, Ivanson's affidavit states that, during his conversation with Shpak, Shpak told him that she had contacted Tseitlin "who. . .would appear in court for me." Ivanson Aff. ¶ 8. During her testimony, Shpak stated that, in fact, she told Ivanson that Tseitlin would "do everything that she's supposed to do as your defense lawyer." Tr. 101. However, there is no suggestion in Shpak's testimony that Ivanson was invoking his right to counsel, beyond assessing when his defense counsel would be arriving. None of these circumstances constitute an

unequivocal invocation of counsel as required by *Davis.*

<u>Tseitlin's 8:31 a.m. call to Walsh Did Not Invoke Ivanson's Right to Counsel</u>

The defense argues that Ivanson invoked his right to counsel at 8:31 a.m. when Tseitlin called Walsh to tell her that she was Ivanson's lawyer and that Ivanson was not be questioned in her absence. Tseitlin Aff. ¶ 8l, Tr. 49. Ivanson has presented evidence that Walsh must have been aware that Tseitlin called her, because Walsh knew Tseitlin's number and because either Walsh retrieved Tseitlin's message at 8:32 a.m. or because Walsh's cellular phone must have registered Tseitlin's telephone number as a missed call sometime after 8:31 a.m. but before 8:35 a.m. Tr. 49-51; 58-63. The government has denied that Walsh was aware that Tseitlin had called her and denies that Walsh retrieved Tseitlin's 8:31 a.m. message anytime before 8:48 a.m. Walsh Decl. ¶7; Tr. 64-65; 81. However, the court finds that whether or not Walsh was aware that Tseitlin had called and requested that Ivanson not be interrogated without counsel is irrelevant to the outcome of the motion. The Supreme Court has stated that "the privilege against compulsory self-incrimination is . . . a personal one that can only be invoked by the individual whose testimony is being compelled." *Moran,* 475 U.S. at 443 n.4. The Court reasoned that, where an attorney has directed police to stop questioning a suspect completely outside the presence of the suspect and unbeknownst to the defendant, the attorney's request could have "no bearing on [the suspect's] capacity to comprehend and knowingly relinquish [his Fifth Amendment] right." *Id.* at 422; *See also U.S. v. Muick*, 167 F.3d 1162, 1166 (7th Cir. 1999). The Second Circuit, relying on *Moran,* in *United States v. Scarpa,* 897 F.2d 63, 68-69 (1990) denied a motion to suppress despite the fact that an attorney, who had been retained by the suspect's stepmother without the suspect's knowledge, directed the prosecutor to cease interrogation before the statements were made. *Id*. This court has extended *Moran* and *Scarpa*

12

to encompass situations where the suspect himself (as opposed to a third party) has retained an attorney and the attorney has requested the police to cease the interrogation outside of the presence of the suspect. *U.S. v. Palmeri*, 97 CR 0356, 1998 WL 765138 *2-3 (E.D.N.Y. April 20, 1998) (Gleeson. J.). In *Palmeri,* Judge Gleeson stated, and this court agrees, that "[i]f the Supreme Court's holding that a suspect's Fifth Amendment rights are 'personal' is to have any meaning, then the fact that an attorney who attempts to invoke those rights without her client's knowledge was previously retained by that client, and not by a third party, should make no difference." *Id.* The court agrees and finds that, even assuming that Walsh retrieved Tseitlin's message at 8:32 a.m. as defendant alleges, Tseitlin's calls to Walsh asking her to cease the interrogation have no bearing on whether Ivanson knowingly waived his Fifth Amendment rights. The mere fact that Walsh was aware that Tseitlin represented Ivanson does not transform her telephone call into an unequivocal invocation of her client's right to counsel. *See Siraj*, 424 F.Supp.2d at 514.

Defendant cites *United States v. Joseph*, 332 F.Supp.2d 571 (S.D.N.Y. 2004) for the proposition that defendant's right to counsel could have arisen by Ms. Tseitlin's making an appearance on the charges. *Id.* at 580. *Joseph*, however, clearly holds that, in order for a defendant's right under the Fifth Amendment to attach, the defendant must personally invoke it. *Id.* Indeed, the court in Joseph explicitly found that the defendant's counsel's admonition to the investigating officers not to question his client did not invoke the defendant's Fifth Amendment rights. *Id* at 579-580. *Joseph's* holding that a Sixth Amendment right to counsel attaches when an attorney makes an appearance (by telephone) is irrelevant to this case. Ivanson's Sixth Amendment rights had not attached at the time he was questioned by the government because he had not yet been arraigned on the charges. *See Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)

(holding that the Sixth Amendment right to counsel attaches after judicial proceedings have been instituted whether by formal charge, preliminary hearing, indictment, information or arraignment); *U.S. v. Aparo*, 221 F.Supp.2d 359, 369 (E.D.N.Y. 2002). The defense also argues that, because a witness can invoke his Fifth Amendment right against self incrimination through an attorney rather than by personally appearing in court, there is no principled reason why an attorney cannot invoke his client's right to counsel post-arrest. However, the fact that an attorney, under certain circumstances, can invoke his client's Fifth Amendment rights outside his client's presence does not change the inherently personal nature of Fifth Amendment rights. *See Moran,* 475 U.S. at 433 n. 4. In *U.S. v. Williams,* 927 F.2d 95 (2d Cir. 1991), the district court judge allowed redacted guilty plea allocations of four former co-defendants to be entered into evidence upon a finding that the former co-defendants were unavailable to testify pursuant to Fed R. Evid 804(a)(1). *Id.* at 99. The former co-defendants were unavailable because they had invoked their Fifth Amendment right against self-incrimination. *Id.* Rather than require the former co-defendants to come to court to personally invoke their right, the court allowed their attorneys to invoke the right for them. *Id.* In finding that there was no error in allowing the attorneys to invoke their client's rights, the Second Circuit found that there was "no reason why [the court] should not have believed the representations of the attorneys." *Id.* However, in a post-arrest scenario, a law enforcement officer is not required to stop interrogating a suspect when counsel asks him to do so, since there is no evidence that the attorney has consulted with the suspect or the suspect had directed his counsel to invoke his Fifth Amendment right on his behalf. Moreover, even though an attorney can invoke a client's Fifth Amendment right (at the client's request) for trial purposes, in the Second Circuit noted in *Williams* that the preferred practice is for a witness claiming the privilege to appear before the trial judge. 927

14

F.2d at 99; *U.S. v. Basciano*, 430 F.Supp.2d 87, 93 (E.D.N.Y. 2006) ("[a] witness need not be physically brought into court to assert the privilege, although it is preferred that the declarant appear before the court to claim the privilege.").

## CONCLUSION

Defendant's motion to suppress his post-arrest statements is denied in its entirety because the court finds that Ivanson knowingly and voluntarily waived his *Miranda* rights and neither his attempts to call his counsel, nor his counsel's message directing the government not to interrogate him in her absence unequivocally invoked those rights after they had been waived.


DATED:      Brooklyn, New York
            March 2, 2007

                                    _____/s/_____
                                    DORA L. IRIZARRY
                                    United States District Judge

15